IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ROCK A. WRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No. 14-cv-1113-CJP**[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Rock A. Wright seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in May 2012, alleging disability beginning on April 27, 2011. (Tr. 10). After holding an evidentiary hearing, ALJ William J. Mackowiak denied the application on September 9, 2013. (Tr. 10-19). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Through counsel, plaintiff raises the following points:

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 9.

1.     The ALJ's findings at step five were not supported by substantial evidence because the ALJ failed to resolve plaintiff's objection to the basis for the VE's testimony and failed to inquire into the reliability of the VE's testimony.

2.     The ALJ failed to obtain a consultative examination.

### Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §423(d)(3).  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. § 404.1572.

In a DIB case, a claimant must establish that he was disabled as of his date last insured.  *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).  It is not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date.  *Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011).

Social Security regulations set forth a sequential five-step inquiry to

2

determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at

step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Mr. Wright was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not

4

abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

ALJ Mackowiak followed the five-step analytical framework described above. He determined that Mr. Wright was insured for DIB only through September 30, 2011, and that he had not engaged in substantial gainful employment since the alleged date of disability. He found that, as of the date last insured, plaintiff had severe impairments of degenerative disc disease, degenerative joint disease and mild to moderate stenosis of the lumbar spine.   He further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical and mental limitations.   Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was not able to do his past relevant work.   He was, however, not disabled because he was able to do other jobs which, according to the VE's testimony, exist in significant numbers in the local and national economies.

## **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

### 1.    **Agency Forms**

Plaintiff was born in 1966, and was almost 45 years old on the alleged onset

date. A prior application for disability benefits had been denied on April 27, 2011. (Tr. 233).

Plaintiff had a tenth grade education. He worked in the past as a lawn mower mechanic, a roofer, and a case packer in a factory. (Tr. 223).

Mr. Wright alleged that he was unable to work because of low back pain, leg problems, trouble walking, bipolar disorder and trouble sleeping. (Tr. 237).

### 2. Request for Production of Data Sources

On August 1, 2013, plaintiff's attorney made a written request to the ALJ to have the VE produce the data sources on which the VE would be relying for her testimony as to the number of jobs at step five. Counsel also objected to the anticipated testimony from the VE as to the number of jobs. (Tr. 285-287).

### 3. Evidentiary Hearing

Mr. Wright was represented by an attorney at the evidentiary hearing on August 16, 2013. (Tr. 55).

Plaintiff testified that he used April 27, 2011, as his date of onset because that is when he stopped working. (Tr. 56). He hurt his low back and his left leg while cutting firewood in January, 2009. It gradually got worse until he had to stop working. He had been told he needed back surgery, but he could not afford it. Dr. Zutschi, who did an MRI, told him to use a cane while walking. He has taken medication such as Flexeril, Norflex, Percocet and Vicodin when he could afford it. (Tr. 60-64).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of

6

plaintiff's age and work history who was able to do work at the sedentary exertional level, with a number of physical limitations and who was also restricted to simple, repetitive tasks.   The VE testified that this person could not do plaintiff's past work.   However, he could do other jobs such as document preparer, circuit board assembler, and telephone quotation clerk.   The VE testified that there were 8,000 document preparer jobs in the State of Illinois and 242,000 in the nation; there were 3,000 circuit board assembler jobs in the State of Illinois and 86,000 in the nation, and there were 1,000 telephone quotation clerk jobs in the State of Illinois and 45,000 in the nation.   (Tr. 79-80).

The ALJ asked if all of the VE's testimony had "been according to the DOT?" The VE replied, "Yes, and the office the (INAUDIBLE) is based on my professional experience.   (Tr. 80-81).

Plaintiff's counsel asked the VE whether her role as a vocational counselor included counting the number of jobs, and she stated that it did not.   Counsel then asked where the VE had gotten her job numbers.   She replied that she used "a program called SkillTRAN."   The VE testified that SkillTRAN uses data from employment surveys and census information.   Counsel asked how the VE arrived at the number using SkillTRAN.   The VE testified, "I enter in the DOT numbers and I click on unemployment numbers and it gives you the numbers based on the region you described and national numbers."   Counsel asked whether the VE did anything "to verify that the numbers that the program provides to you are accurate?"   The VE replied, "No."   The VE also testified that she had done labor market surveys herself, but she could not say how many different ones she had

done.   (Tr. 81-83).   The ALJ asked again whether the VE's testimony had "been in accordance with the information in the DOT or otherwise?"   The VE said that it had been, and that her testimony regarding "the [INAUDIBLE] tolerance and the absenteeism is based on my professional experience."   (Tr. 83).

### 4.   Medical Treatment

Plaintiff went to the emergency room for low back pain in March 2009. X-rays of the lumber spine showed no fracture, subluxation, spondylolisthesis or spondylolysis, and no significant disc space narrowing.   (Tr. 363-367).   He went to the emergency room again in July 2009, complaining of back pain, and was upset that he could not get anyone to help him because he had no money or insurance. (Tr. 350).

X-rays taken in October 2009 were negative except for mild degenerative changes in the lower lumbar spine.   (Tr. 338).

There are no records of any medical treatment during the period at issue (April 27, 2011, through September 30, 2011).

Dr. Rutngamlug saw Mr. Wright in March 29, 2012.   He told her that he had hurt his back four years prior and been to the emergency room several times.   He had filed for disability and had been denied.   He walked with a limp and had some tenderness of the low back.   (Tr. 375).

In April 2012, plaintiff went to the emergency room at Crossroads Community Hospital.   He said that he had hurt his back about four years earlier, and that he could not get a doctor to see him because he had no insurance and no money.   It was noted that he walked into the emergency room with "unsteady gait,

grabbing equipment and walls to steady himself" and he "appeared to be dragging his foot."   He had never had a CT or MRI, but talked about having narrowing and disc herniation.   An x-ray staffer reported that plaintiff was walking down the hall earlier with a slight limp, but was moving at a fast pace with no unsteady gait.   (Tr. 378).   Physical examination showed mild tenderness to palpation of the mid and lower lumbar spine.   Straight leg raising was negative bilaterally.   Motor strength was intact in both lower extremities.   The impression was chronic low back pain. The doctor prescribed Flexeril and Relafen, and advised Mr. Wright to follow up with a doctor and request an MRI.   (Tr. 380-382).

A lumbar MRI was done on July 24, 2012.   This study showed a mild-moderate broad central nuclear protrusion at L4-5, mild neural foraminal stenosis at L2-3, L3-4 and L4-5, and mild right disc bulge at L5-S1 associated with a concentric annular tear.   (Tr. 438).

## Analysis

The Court agrees that plaintiff's first point regarding the VE's testimony is meritorious and requires remand.

"The Commissioner bears the step-five burden of establishing that the claimant can perform other work that 'exists in significant numbers in the national economy.'"   *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008), citing 20 C.F.R. § 404.1560(c)(2).

The testimony of a VE can constitute substantial evidence to support the ALJ's step five finding, but only if that testimony is reliable.   *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004).   Although the Federal Rules of Evidence do not

apply in administrative proceedings, expert witnesses still must use "reliable methods" to arrive at their conclusions.   "If the basis of the vocational expert's conclusions is questioned at the hearing, however, then the ALJ should make an inquiry (similar though not necessarily identical to that of Rule 702 [Federal Rules of Evidence]) to find out whether the purported expert's conclusions are reliable." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002).   Further, while a vocational expert may give a "bottom line" answer, "the data and reasoning underlying that bottom line must be 'available on demand' if the claimant challenges the foundation of the vocational expert's opinions."   *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004), citing *Donahue*, 279 F.3d at 446.

Here, plaintiff's counsel challenged the foundation of the VE's opinions as to the number of jobs, both prior to and at the hearing.   Therefore, the ALJ had a duty to enquire into the basis for the VE's opinions to determine whether her testimony was reliable.   *Donahue, supra; McKinnie, supra*.

ALJ Mackowiak failed to adequately enquire into the basis for the VE's opinions.   He asked only whether her testimony was in accordance with information in the DOT.

20 C.F.R. § 404.1566(d) provides that the agency "will take administrative notice of reliable job information available from various governmental and other publications," including the *Dictionary of Occupational Titles*.   The DOT is a "compendium of job descriptions published by the Department of Labor." *Browning v. Colvin*, 766 F.3d 702, 708 (7th Cir. 2014).   As a source of reliable evidence, it has obvious shortcomings, since it is no longer published, the "current"

10

edition is 23 years old, and most of the information in it is from 1977.   *Browning,*
*Ibid.*

The Seventh Circuit has described the DOT as "obsolete" and has pointed out, moreover, that it "contains no statistics regarding the number of jobs in a given job category that exist in the local, state, or national economy."   *Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014).   See also, *Voigt v. Colvin*, 781 F.3d 871, 879 (7th Cir. 2015) ("[T]he DOT does not contain information on which to base an estimate of the number of available jobs of a particular kind.")   Therefore, the ALJ's question about any conflict between the VE's testimony and information in the DOT did nothing to establish the reliability of the VE's conclusion as to the number of jobs.

Of course, the VE did not claim to rely on the DOT for her opinion as to job numbers.   Rather, she said she obtained the numbers from SkillTRAN.   While she also testified that she had done some labor market surveys, the VE did not claim that she relied on her own surveys as a basis for her testimony.   She also testified that she did nothing to confirm the accuracy of the SkillTRAN numbers.   (Tr. 82-83).   The ALJ did not ask any questions about SkillTRAN.

The VE was referring to the SkillTRAN Job Browser Pro software program. This is a commercially produced software program that includes information from the DOT, along with additional information, including estimates of job numbers. SkillTRAN is not a government publication. The current price for the program is $549.00.   See,   http://www.skilltran.com/index.php/products/pc-based-solutions /job-browser-pro, visited on November 18, 2015.

11

The VE did not testify that the job numbers contained in SkillTRAN are accurate or reliable, or that SkillTRAN is generally accepted and relied upon by vocational experts.   On its website, SkillTRAN LLC represents that its method of estimating job numbers is "the result of 20+ years of discontent with the 'generally accepted practice' among many vocational experts - often built on the faulty assumption that all DOT occupations occur with equal frequency within a given Census or OES Statistical Group."   The company describes it method as "a 'disruptive' new methodology - meaning that it shakes up the disability market and causes folks to reconsider traditional methods."   http://www.skilltran.com /index.php/support-area/documentation /216-job-numbersSkillTRAN, pop-up box entitled "Method to Estimate DOT Employment using government statistics SkillTRAN LLC - June 2008," visited on November 18, 2015.

SkillTRAN's description of its methodology was posted in 2008.   Its methodology may no longer be "new" or "disruptive."   It may very well be widely accepted by experts in the field.   The problem is that the ALJ made no attempt to confirm that relying on SkillTRAN's numbers was a reliable method for the VE to formulate her opinions in this case.

The Commissioner argues that the ALJ did not commit any error because plaintiff's counsel "thoroughly questioned" the VE about the basis of her testimony, and because the VE also relied upon her professional experience.   Doc. 22, pp. 11-12.   The latter assertion is not an accurate reflection of the VE's testimony. While she stated that she relied on her professional experience regarding "(INAUDIBLE) tolerance and absenteeism," she did not claim that her testimony

12

about job numbers was based on her professional experience.   (Tr. 83).   She was quite clear that her job numbers testimony was derived from the SkillTRAN computer program.   (Tr. 82).   As to the former assertion, counsel's questioning did not establish that the VE's testimony was reliable.   The burden to do so was on the Commissioner, not the plaintiff, at step five.   *Zurawski*, 245 F.3d at 886.

Citing *Liskowitz v. Astrue*, 559 F.3d 736, 743-744 (7th Cir. 2009), the Commissioner argues that a VE need not be a statistician and may rely on widely accepted sources as a basis for determining the number of jobs.   As a general proposition, this is true.   The problem here is that there was no evidence that the SkillTRAN program is widely accepted.   The VE did *not* testify that it is widely accepted, and the ALJ did not enquire.

The Commissioner also argues that the SkillTRAN program has been recognized by the agency as an acceptable source of information on jobs numbers. Doc. 22, p. 12.   As support, she cites to an agency memo attached to plaintiff's brief, Doc. 16.

The memo cited by the Commissioner is a memo dated December 28, 2009, from the Director, Division of Field Procedures to Regional Management Officers. The memo states that there are "four acceptable electronic versions" of the DOT, including SkillTRAN Job Browser Pro.   The memo goes on to note that the commercially available version of the SkillTRAN program contains information that has been removed from the agency's version.   The memo cautions that the four electronic versions of the DOT, including SkillTRAN Job Browser Pro, "cannot be relied upon to produce results that always conform to SSA medical and vocational

13

policy, nor do they replace reliance on SSA regulations and rulings, VE testimony, and adjudicative judgment and decisionmaking."   Doc. 16, Ex. 1.

The memo from the Director, Division of Field Procedures, does not establish that the VE's testimony here was reliable.   First, the memo is just that, a memo, and it does not have the force of law.   See, *Schweiker v. Hansen*, 101 S. Ct. 1468, 1471 (1981), holding that the agency's Claims Manual "has no legal force" because it not a regulation.   Further, the memo does not say that the SkillTRAN program is a reliable source of data *on jobs numbers*.   It says that the program is an acceptable electronic version of the DOT.   The memo recognizes that the commercially available version of the program contains information that is not in the DOT.   If it did not, it is difficult to see why anyone would pay in excess of $500.00 for it.   The DOT does not contain data on jobs numbers.   *Herrmann,* 772 F.3d at 1113.   And, if it did, those numbers would be out of date, since the DOT has not been revised in years.   The fact that the Director, Division of Field Procedures, in 2009 considered the SkillTRAN program to be an acceptable electronic version of the DOT does not establish that she, much less the agency, recognizes the SkillTRAN program as a reliable source of jobs numbers information  -   information that does not appear in the DOT.

In addition, plaintiff's counsel challenged the basis for the VE's testimony and requested the data upon which she relied before the hearing.   (Tr. 285-287).   That data was not produced at the hearing, but it should have been.   *McKinnie,* 368 F.3d at 911.   See, *Britton v. Astrue*, 521 F.3d 799, 804 (7th Cir. 2008), suggesting ways that the "available on demand" rule can be applied "to achieve the

14

proper balance between the needs of the claimant to effectively cross-examine the VE and the needs of the Commissioner to hold efficient hearings."

Counsel again challenged the reliability of the VE's testimony in his post-hearing brief, Tr. 291-295.   While the ALJ stated that he "considered" the brief, Tr. 10, he did not address the reliability of the VE's testimony as to jobs numbers or the fact that the data on which the VE relied had not been made available to counsel at the hearing.   He only observed that the VE's testimony was consistent with information contained in the DOT, but, again, the DOT does not contain information about jobs numbers.

In short, neither the record before the ALJ nor any applicable regulation establishes that the VE's conclusions based on the SkillTRAN program were reliable.   Therefore, the ALJ's decision at step five was not based on substantial evidence.   *Overman*, 546 F.3d at 464.

Plaintiff's second point can be swiftly disposed of.   He argues that, in view of the limited medical evidence in the record, the ALJ had a duty to obtain a consultative examination in order to fully develop the record.

Mr. Wright argues that the medical evidence is sparse because he had no money and no health insurance.   He does not, however, advance a convincing argument for why a consultative exam was indicated.

Plaintiff was insured for DIB only through September 30, 2011.   His current application for DIB was filed in May 2012.[2]   There are no medical records for the

---

[2] Mr. Wright had earlier applied for both DIB and SSI.   Those applications were denied on April 27, 2011, the date on which he alleges he became disabled in his current application.   Tr. 86.

period between his alleged date of onset and his date last insured. There are, however, records that postdate the date last insured, including an MRI of the lumbar spine.

Courts generally defer to the ALJ's decision about whether to order a consultative examination. Noting that the clamant has the "primary responsibility for producing medical evidence demonstrating the severity of impairments," the Seventh Circuit has recognized that, "because it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected." *Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). Plaintiff offers no reason to believe that a consultative exam performed long after his insured status expired would reveal information relevant to his condition before September 30, 2011. In the circumstances presented here, the failure to order a consultative exam was not error.

Because of the ALJ's error at step five, this case must be remanded. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Wright was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## **Conclusion**

The Commissioner's final decision denying Rock A. Wright's application for social security disability benefits is **REVERSED** and **REMANDED** to the

16

Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   November 19, 2015.**


**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**